Martha M. MENZEL, Mary B. Rice,
Barbara G. Racine, and Virginia W.
Grubbs, Plaintiffs,

v.

COUNTY UTILITIES CORPORATION,
Defendant.

Civ. A. No. 77–725–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Dec. 6, 1979.

their amended complaint. Consequently, no genuine issue of material fact remains to be resolved, and County Utilities is entitled to summary judgment pursuant to Rule 56, Fed.R.Civ.P. Plaintiffs, on the other hand, seek partial summary judgment in their motion, filed August 6, 1979, contending that defendant unlawfully discharged waste water from July 1, 1977, to June 8, 1979. Plaintiffs further assert that the discharge permit as modified by the state Circuit Court's decree of June 8, 1979, violates federal statutory and constitutional standards. Before addressing the merits of these motions, the Court will briefly review the background of the case.

Patrick M. McSweeney, McSweeney & Stutts, Richmond, Va., for plaintiffs.

E. Leslie Cox, Breeden, Howard & Mac-Millan, Norfolk, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

Plaintiffs are all residents of the Birchwood Gardens area of the City of Virginia Beach, Virginia. They are recreational users of the Lynnhaven River and its tributaries, particularly Buchanan Creek adjacent to their respective homes. Defendant County Utilities Corporation (hereinafter "County Utilities") is a Virginia corporation which owns and operates a sewage treatment plant in the Birchwood Gardens area and discharges treated waste water into Buchanan Creek.

This matter is now before the Court on cross–motions for summary judgment by plaintiffs and defendant. Defendant's motion, filed July 19, 1979, asserts that a Final Decree entered June 8, 1979, by the Circuit Court of the City of Virginia Beach determined favorably to defendant the factual and legal claims alleged by plaintiffs in

### I.

This action arose under the provisions of the Federal Water Pollution Control Act (FWPCA) Amendments of 1972, 33 U.S.C. §§ 1251 et seq., which required every publicly–owned and privately–owned sewage utility in the United States to obtain a National Pollutant Discharge Elimination System (NPDES) permit no later than July 1, 1977. 33 U.S.C. §§ 1311, 1342.[1] Not only must the utility meet federal standards in order to obtain a NPDES permit, but section 301(b)(1)(C) of the FWPCA 1972 Amendments also requires that the utility meet any more stringent limitations established by state law or regulations:

(b) In order to carry out the objective of this chapter there shall be achieved—

. . . . .

(C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to implement any appli-

---

1. The administration of the NPDES permit program was initially handled by the Administrator of the Environmental Protection Agency. Pursuant to 33 U.S.C. § 1342(b), the adminis-tration of the program has been transferred to the Virginia State Water Control Board, which state agency issued the NPDES permit in question in this case.

cable water quality standard established pursuant to this chapter.

33 U.S.C. § 1311(b)(1)(C).

The amended complaint, filed December 20, 1977, alleges that defendant "continues to discharge pollutants to the nation's waters from its Birchwood Gardens sewage treatment plant in violation of 33 U.S.C. § 1311." Amended Complaint at ¶ 16. In particular, the amended complaint charges that County Utilities has failed to comply with Special Standard "j,"[2] adopted by the Virginia State Water Control Board (hereinafter "Water Control Board") in 1966 and 1970, and has failed to connect to central sewage treatment facilities by July 1, 1977, as required by its NPDES permit.[3]

Defendant holds NPDES Permit No. Va. 0060691, with an effective date of November 15, 1976, and an expiration date of June 30, 1982. The permit authorizes a daily discharge of 0.8 million gallons of treated waste water into the Buchanan Creek. The permit further required that defendant terminate this discharge and connect to central sewage treatment facilities by July 1, 1977.[4] The defendant appealed to the Circuit Court of Virginia Beach, Virginia, on December 1, 1976, challenging both the permit requirement that it connect to central facilities by June 1, 1977, and the enforcement against it of Special Standard "j."

By an August 21, 1978, Order of this Court, discovery in this case was ceased, pending the outcome of the case in the Virginia Beach Circuit Court. On April 5, 1979, the Honorable Henry L. Lam, Judge of the Circuit Court of the City of Virginia Beach, Virginia, issued an Opinion in the case of *County Utilities Corporation v. Commonwealth of Virginia, ex. rel. State Water Control Board*, At Law No. L–4139, which he incorporated by reference into his Final Decree of June 8, 1979.

Judge Lam found that "[t]he State Water Control Board's Special Standard 'j' objective for Nitrogen removal to a level of 0.5 milligram per liter of sewage treatment plant effluent is neither technologically achievable nor economically feasible, and, therefore, is void and unenforceable." Final Decree at 2. Not only did the state judge declare Special Standard "j's" nitrogen objective[5] "void and unenforceable," but he modified County Utilities' NPDES permit so as to remove the requirement from the permit that County Utilities connect their sewage treatment plant discharges to the central facilities of Hampton Roads Sanitation District.[6] Final Decree at

---

2. Special Standard "j" set an objective for nitrogen removal at a level not greater than 0.5 milligram per liter of sewage treatment plant effluent at any given time and for phosphorous removal at a level not greater than 1.0 milligram per liter of sewage treatment plant effluent at any given time.

3. Plaintiffs seek declaratory and injunctive relief, as well as fines pursuant to 33 U.S.C. § 1319(d) and attorney's fees pursuant to 33 U.S.C. § 1365(d).

4. The requirement that County Utilities connect to central facilities arose from § 62.1–44.-19:1, Code of Virginia 1950, as amended, which reads:

Whenever the State Department of Health or the State Water Control Board determines that a receiving stream in Virginia Beach is being polluted by the sewage discharge from a private or public sewage utility, and that it is possible to connect such utility to the sewage system of a municipality, sewage treatment authority, or sanitation district, the Board is hereby empowered to order the utility in Virginia Beach to stop such discharge into the receiving stream. The utility shall discontinue the said discharge either by adequate treatment as determined by the State Department of Health or Water Control Board, or by connection to central facilities, either of which is to occur within one year. The Water Control Board applied this statute to the Lynnhaven River Watershed, which includes Buchanan Creek.

5. The state court did not declare the phosphorous objective of Special Standard "j" void and unenforceable; however, this phosphorous objective is not a material issue in this federal suit. See note 2 *supra* for delineation of the phosphorous removal objective in Special Standard "j."

6. The state judge made this permit modification on the basis that the Water Control Board had acted beyond its authority under § 62.1–44.19:1, Code of Virginia 1950, as amended, because it failed to make the initial determination that the "receiving stream in Virginia Beach is being polluted by the sewage discharge from a private or public sewage utility

2 with attached modified Permit No. VA. 0060691. This modification was made effective back to November 15, 1976, to continue through the duration of the permit to June 30, 1982. *Id.* Finally, Judge Lam made sure that defendant's modified permit complied with secondary treatment requirements. As he stated in his Opinion of April 5, 1979, at page 2: "10. Secondary Treatment represents that level of sewage treatment required by the federal government; this level of treatment is presently required of County, Kempsville and HRSDC." Thus, County Utilities' modified NPDES permit does comply with federal requirements, and plaintiffs have not argued otherwise.

## II.

■ A federal court must accord full faith and credit to a judgment entered by a state court of competent jurisdiction. 28 U.S.C. § 1738.[7] In effect, then, the "federal court presented with a state court judgment is required to give that judgment the same force and [conclusive] effect as it has in the state in which it was rendered." *Winters v. Lavine*, 574 F.2d 46, 54 (2d Cir. 1978), *quoting, Mitchell v. National Broadcasting Co.*, 553 F.2d 265, 274 (2d Cir. 1977). *See Davis v. Davis*, 305 U.S. 32, 39–40, 59 S.Ct. 3, 83 L.Ed. 26 (1938) (federal court must give same effect to state court decision as would be given by another state court). Therefore, it becomes necessary to examine the res judicata effect of the state court judgment within the state itself. *See Riley v. New York Trust Co.*, 315 U.S. 343, 349, 62 S.Ct. 608, 86 L.Ed. 885 (1942); *Davis v. Davis, supra.*

■ This Court is well aware that Virginia courts invoke the doctrine of res judicata to bar relitigation of an issue by a party that was also a party to the prior litigation. *E. g., Bates v. Devers*, 214 Va. 667, 202 S.E.2d 917, 920–22 (1974). *See Moore v. Allied Chemical Corp.*, 480 F.Supp. 364, n. 4 and accompanying text (E.D.Va. 1979). The Court is further cognizant of the fact that the state court litigation was between County Utilities and the Commonwealth, of Virginia, *ex rel.* the State Water Control Board, and that the plaintiffs in this case were not *named* parties in the state proceeding. However, under the doctrine of *parens patria*, a state is deemed to represent all of its citizens, when the state is a party in a suit involving a matter of sovereign interest. *See, e. g., New Jersey v. New York*, 345 U.S. 369, 73 S.Ct. 689, 97 L.Ed. 1081 (1953); *Georgia v. Pennsylvania R. R.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051, *rehearing denied*, 324 U.S. 890, 65 S.Ct. 1018, 89 L.Ed. 1437 (1945); *Environmental Defense Fund, Inc. v. Higginson*, 631 F.2d 738 (D.C.Cir. 1979). There is a presumption that the state as *parens patria* will represent adequately the position of its citizens. *Id.*

Although the foregoing cases in regard to the doctrine of *parens patria* generally deal with citizens' petitions to intervene and, therefore, are distinguishable from the present case, the underlying principle is still applicable to this case. First, the meaning, purpose, and effect of state statutes and regulations relating to the discharge of sewage into state waters are matters of "sovereign interest." Moreover, plaintiffs do not contend that the Commonwealth of Virginia did not adequately represent their interests in the state court; rather, they contend that they themselves were not parties to the state court litigation and, therefore, they are not bound by the Final Decree of the Virginia Beach Circuit Court. The doctrine of *parens patria*, however, renders this argument fallacious because the plaintiffs by implication were parties to the

...," as required by the Virginia statute. For text of statute, see note 4 *supra.*

**7.** This section reads in pertinent part:
  Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

state court proceeding[8] and currently are bound by that decision.

More importantly, 28 U.S.C. § 1652 provides:

*State laws as rules of decision*

The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress, otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

Therefore, under § 1652, this Federal Court must follow the interpretation given Virginia law by a Virginia court, absent convincing evidence that the law of the state is otherwise. *See, e. g., Six Companies of California v. Joint Highway District No. 13,* 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114 (1941).

In regard to the case presently before this Court, the Circuit Court of the City of Virginia Beach held that §§ 62.1–44.4 *et seq.* of the Code of Virginia 1950, as amended, gave the State Water Control Board no power to enforce the unattainable effluent limitations established by Special Standard "j" and declared what the valid portions of County Utilities NPDES permit are under state law and standards. This Court not only finds no convincing argument that the state law is different from the interpretation given by the Virginia Beach Circuit

Court but incorporates that state court Opinion of April 5, 1979, and the Final Decree of June 8, 1979, in the case of *County Utilities Corp. v. Commonwealth of Virginia, ex rel. State Water Control Board,* At Law No. L–4139, as an Appendix to this Memorandum Opinion and Order. Accordingly, this Court currently is bound by the announcement of state law in the state court opinion and decree and finds no merit to plaintiff's present contention that the state court opinion and decree violate federal and constitutional standards.

■ Having examined closely the amended complaint, this Court is of the opinion that the state court resolved the issues raised by plaintiffs, leaving no genuine issue of material fact in dispute. As previously stated, the plaintiffs' contentions were based upon County Utilities' alleged violation of 33 U.S.C. § 1311(b)(1)(C). This section made more stringent state standards and limitations applicable to the NPDES permits, thereby giving rise to the allegations in the amended complaint that County Utilities was in violation of the FWPCA 1972 Amendments because its discharge was not meeting Special Standard "j" and because it had not connected to central facilities as required by the State Water Control Board. However, these Virginia state standards in question–Special Standard "j" and the requirement to con-

---

**8.** Moreover, defendant has stated as fact that plaintiffs fully participated in the administrative proceedings and in the state court proceedings:

Plaintiffs participated at every stage of the administrative proceedings before the Virginia State Water Control Board. Barbara Racine and Margie Rice participated in the N.P.D.E.S. permit public administrative hearing of June 24, 1976. Barbara Racine and Margie Rice appeared to oppose County Utilities Corporation at the N.P.D.E.S. permit public administrative hearing of March 4, 1977. Patrick McSweeney, Esq., represented Plaintiffs and opposed any change to the permit at the N.P.D.E.S. permit hearing of November 16, 1977, which Plaintiffs attended. Patrick McSweeney, Esq. represented Plaintiffs and again opposed the relief from the connection requirement there sought by County Utilities Corporation at the N.P.D.E.S. permit hearing

of December 8, 1977, before the State Water Control Board itself, which Plaintiffs attended. Patrick McSweeney and Plaintiffs appeared at the 1978 pretrial hearings in the Virginia Beach Circuit Court. Plaintiffs attended the trial of the appeal before the Virginia Beach Circuit Court on February 8, 9, 12 and 13, 1979, and the post trial hearing of May 25, 1979.

Timothy Hayes, the Assistant Attorney General of Virginia, who represented the Commonwealth of Virginia State Water Control Board during the administrative hearings after June, 1976, and before the Virginia Beach Circuit Court, has participated at every stage of these Federal Court proceedings. *Brief of County Utilities Corporation in Support of Its Motion for Summary Judgment,* at 2 (July 19, 1979). Plaintiffs have not contested this statement of facts by defendant.

nect to central facilities—were both voided by Judge Lam in his Opinion and Final Decree. Both the plaintiffs and this Court currently are bound by the state court opinion and decree. Moreover, there is no merit to plaintiffs' present arguments that defendant unlawfully discharged from July 1, 1977, to June 8, 1979, the date of the state court Final Decree, because Judge Lam specifically gave the permit modifications retroactive effect to November 15, 1976. Final Decree at 2 with attached modified Permit No. VA. 0060691.

Although under §§ 17–123, 62.1–44.29, Code of Virginia 1950, as amended,[9] the Circuit Court of the City of Virginia Beach had appellate jurisdiction over the decision of the State Water Control Board and was, therefore, a court of competent jurisdiction, an appeal of the Circuit Court decree was taken on August 28, 1979, to the Virginia Supreme Court, styled *Virginia State Water Control Board v. County Utilities Corporation*, No. 79–1336.[10] Therefore, this Court exercises its discretion and declines entry of an order granting or denying the motions for summary judgment, pending

the outcome of the matter in state court. *See Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.*, 600 F.2d 1228 (7th Cir. 1979) (federal district court action may be stayed pending determination of a parallel state court action); *Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873, 876 (4th Cir. 1978) (federal district court ordered to stay judgment pending final decision by Supreme Court of Virginia in a parallel proceeding); *Maryland Casualty Co. v. Boyle*, 123 F.2d 558, 564 (4th Cir. 1941) (where prior action involving same parties and same issues has been filed in a court with concurrent jurisdiction, and decision by the other court would resolve dispute, federal court may exercise discretion and stay proceedings pending outcome in other court). *See also Aetna Casualty & Surety Co. v. Yeatts*, 99 F.2d 665 (4th Cir. 1938); *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321 (4th Cir. 1937). Accordingly, the proceedings in this Court are ORDERED STAYED pending the outcome of the case in the Supreme Court of Virginia.[11]

**9.** Those sections provide in pertinent part:

§ 17–123. Jurisdiction of circuit courts.— ... They shall have appellate jurisdiction of all cases, civil and criminal, in which an appeal, writ of error or supersedeas may, as provided by law, be taken or allowed by such courts, or the judges thereof, from or to the judgment or proceedings of any inferior tribunal. They shall also have jurisdiction of all other matters, civil and criminal, made cognizable therein by law ....

§ 62.1–44.29. Judicial review.—(1) Any owner aggrieved by a final decision of the Board under §§ 62.1–44.15(5), 62.1–44.15(8), 62.1–44.16, 62.1–44.17, 62.1–44.19 or 62.1–44.25, whether such decision is affirmative or negative in form, is entitled to judicial review thereof under this chapter either in the Circuit Court of the city of Richmond or in any court of record having jurisdiction in the city or county in which such owner resides or in which is located the principal office of his business, or in which is located his property affected by the decision complained of.

　·　　·　　·　　·　　·

(7) The court may affirm the decision of the Board or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellant have been prejudiced because the findings, conclusions or decisions are (a) in viola-

tion of constitutional provisions; or (b) in excess of statutory authority or jurisdiction of the Board; or (c) made upon unlawful procedure; or (d) affected by other error of law; or (e) unsupported by the evidence on the record considered as a whole; or (f) arbitrary, capricious, or an abuse of discretion.

**10.** As of date no action has been taken by the state Supreme Court, either to grant or to deny the appeal.

**11.** The current opinion of this Court does not alter Judge MacKenzie's Memorandum Opinion of May 17, 1978 (cited as Mem.Op.), in which this Court recognized that the plaintiffs had a federal cause of action under the FWPCA 1972 Amendments, as there is concurrent federal and state court jurisdiction over state–issued NPDES permits. Mem.Op., *supra*; *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board*, 453 F.Supp. 122 (E.D.Va. 1978) (Merhige, J.). In this case, although the plaintiffs have a federal cause of action, the state court opinion and decree currently resolved the issues which are the basis of the federal suit, leaving no further material issue for this Court to decide at this time because, for the reasons set forth in this Opinion, this Court and the parties, both plaintiffs and defendant, currently are bound by the state Circuit Court opinion and decree.

**360**

## APPENDIX

VIRGINIA: IN THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH

COUNTY UTILITIES CORPORATION :
                    :
v.                  : AT LAW NO. L–4139
                    :
COMMONWEALTH OF VIRGINIA, :
ex rel.                :
STATE WATER CONTROL BOARD :
                    :
                    :
KEMPSVILLE UTILITIES CORPO- :
RATION               :
                    :
v.                  : AT LAW NO. L–5655
                    :
COMMONWEALTH OF VIRGINIA, :
ex rel.                :
STATE WATER CONTROL BOARD :

## OPINION

In preparing this opinion embodying my decision as to the issues in controversy, and considering the expressed intention of the parties, either or both, of an appeal of such decision, I have in consideration of the appellate bench provided for a "Glossary" of terms, exhibits and code sections that touch upon the issues, and which will serve to aid and illuminate those issues in resolving this case. Such "Glossary" is as follows:

### TERMS

1.  BOARD refers to the State Water Control Board.

2.  BPT Best practical treatment available.

3.  COUNTY refers to the petitioner, County Utilities Corporation which was chartered in Virginia in 1955, and pursuant to § 56–232 of the Code became a public utility. COUNTY is engaged in the collection, treatment and discharge of sewage within the City of Virginia Beach. Effluent from COUNTY empties into Buchanan Creek, a branch of the Lynnhaven River. COUNTY is authorized 2000 customer connections, but actually services 1650 connections.

4.  FEDERAL WATER POLLUTION CONTROL ACT first adopted in 1965 as (Public Law 89–234) which required each state to adopt certain water quality standards by June 30, 1967. This act was amended by the Congress of 1972 (Public Law 92–500), and the amendment imposed additional and stricter standards regarding water pollution control.

5.  HRSDC Hampton Roads Sanitation District Commission.

6.  KEMPSVILLE refers to the petitioner, Kempsville Utilities Corporation which was chartered in Virginia in 1958, and pursuant to § 56–232 of the Code became a public utility. KEMPSVILLE is engaged in the collection, treatment and discharge of sewage within the City of Virginia Beach. Effluent from KEMPSVILLE empties into the Eastern Branch of the Elizabeth River. KEMPSVILLE is authorized 2500 customer connections, but actually services 1900 connections.

7.  NPDES National Pollution Discharge Elimination System Permit Program.

8.  ORDER ON PRE–TRIAL CONFERENCE refers to ORDER entered November 30, 1978 by the Honorable Robert S. Wahab, Jr., disposing of certain motions and/or pleadings and consolidating the issues to be tried.

9.  POINT SOURCE This, thru testimony, I learned to be a technical term used to describe a specific discharge location where a pipe, drainage ditch, etc. discharges effluent into a creek, river, etc.

10.  SECONDARY TREATMENT represents that level of sewage treatment required by the federal government; this level of treatment is presently required of COUNTY, KEMPSVILLE and HRSDC.

11.  SPECIAL STANDARD "j" (See EXH. A–52, at page 55) "Objective for Nutrients–The cumulative total of nitrogen as N from all sources in the effluent shall not be greater than 0.5 mg/1 at any time; phosphorous as P from all sources in the effluent shall not be greater than 1.0 mg/1 at any time.

12.  SPECIAL STANDARD "k" (See EXH. A–52, at page 55) "The State Water Control Board has directed and/or ordered the following:

1. That all existing discharges in accordance with j above shall substantially remove the nutrients in their effluents on or before such time as central facilities (The Hampton Roads Sanitation District Commission Chesapeake–Elizabeth System) become available or connect to central facilities, (i. e. The Chesapeake–Elizabeth System). 2. That it will consider approving small discharges to this watershed to facilitate the elimination of potential public health hazards provided central facilities (Chesapeake–Elizabeth System) are not available, and 3. That it will consider approving small discharges to this watershed, which do not provide for nutrient removal facilities in accordance with j above."

*Code Sections*

13. § 56–232 Charter of public service corporations by State

14. § 62.1–44.1 Persons subject to regulations by the BOARD

15. § 62.1–44.2 present section establishing the purpose of the State Water Control Board

16. § 62.1–44.3(5) definition of owner

17. § 62.1–44.4 section providing control by State as to water quality

18. § 62.1–44.15 section setting forth powers and duties of BOARD

19. § 62.1–44.29 section providing for judicial review of action of the BOARD

*Exhibits*

COUNTY and KEMPSVILLE Exhibits are marked consecutively "A–1" thru "A–86".

BOARD Exhibits are marked consecutively "D–1" thru "D–12".

20. EXH. A–42 This is designated as a "draft" of a proposed permit, dated November 25, 1975, by the BOARD for both COUNTY and KEMPSVILLE. In essence, based on conclusions by the BOARD that the nitrogen level of 0.5 mg/1 was neither economically nor physically feasible, the permit was to provide for a nitrogen level in the plant effluent not to exceed 2.0 mg/1.

21. EXH. A–47 Internal Memorandum of the BOARD regarding KEMPSVILLE, dated February 28, 1977. Staff conclusions of L. S. McBride, Director of the Tidewater Office of the Water Control Board: (1) that enforcement of the phosphorous level as specified in Special Standard "j" appears to be justified, and (2) that enforcement of total nitrogen level as specified in Special Standard "k" does not appear to be justified.

22. EXH. A–48 NPDES Permit No. VA 0060691 to COUNTY, issued January 9, 1978; Effective date November 15, 1976; Reissuance date June 30, 1977; Expiration date June 30, 1982. This permit included "ATTACHMENT B", which contained the following language:

"Final Effluent Requirements and Schedule of Compliance to Meet These Requirements

1. Schedule of Compliance

The permitee shall achieve compliance with the final effluent requirements by July 1, 1977.

2. *Final Effluent Requirements*

The permitee shall connect to central sewerage facilities.

23. EXH. A–49 NPDES Permit No. VA 0060682 to KEMPSVILLE, issued January 9, 1978; Effective date October 1, 1976; Reissuance date June 30, 1977; Expiration date June 30, 1982. This permit included "ATTACHMENT B", which contained the following language:

"Final Effluent Requirements and Schedule of Compliance to Meet These Requirements

1. Schedule of Compliance

The permitee shall achieve compliance with the final effluent requirements by July 1, 1977.

2. *Final Effluent Requirements*

The permitee shall connect to central sewerage facilities.

24. EXH. A–52 WATER QUALITY STANDARDS MANUAL issued by the BOARD on November 19, 1974. Its preface page presents a brief history of the BOARD. The BOARD was established in 1946, and from then until 1965 acted upon water control problems by establishing treatment requirements on a case–by–case basis. With the enactment of the Federal Water Control Act of 1965 (Public Law 89–234) each state was required to adopt certain water quality standards by June 30, 1967. Further, in the absence of state action, the Secretary of the Interior was empowered to establish the required standards. The BOARD pursuant thereto elected to adopt the required standards and did so prior to June 30, 1967. The standards initially adopted were substantially amended by Public Law 92–500, enacted in October of 1972. The state was required to submit its standards to the Environmental Protection Agency for approval. Special Standard "j" and "k", acknowledged by both the BOARD and COUNTY/KEMPSVILLE as the crux of this controversy are found on page 55 of this Exhibit.

To direct attention to and narrow the specific controversy before this court, "Sewage", by Black's, is defined as "refuse and foul matter, solid or liquid, carried off by sewer." "Pollutant" according to "Webster's" is "something that pollutes", and "Black's" defines "Pollute" as meaning "to corrupt or defile". With this knowledge, then I am able to say that the only pollutants which have been brought to the court's attention, in this case, are those referred to as "nutrients".

"Nutrient", according to Webster's is defined "to nourish; furnishing nourishment. A nutritive substance or ingredient."

The evidence in this case indicated that although it is not a present problem, within the particular water basins concerned in this case, that nutrients support the growth of algae and other plant life, which growth in sufficient amounts utilizes the oxygen in the body of water, thereby being destructive to fish and shellfish. Nutrients referred to in this case are "Phosphorous" and "Nitrogen".

The trial here proceeds by an appeal, pursuant to § 62.1–44.29 of the Virginia Code by COUNTY. This petitioner/appellant is appealing the NPDES Permit No. VA. 0060691 issued on January 9, 1978 (Glossary No. 22). Additionally, and consolidated for trial, is the appeal of KEMPSVILLE. This petitioner/appellant is appealing the NPDES Permit No. VA. 0060682 issued on January 9, 1978 (Glossary No. 23).

Although distinct legal entities, the appellants share basically common ownership and management. Both permits required, among other matters pertaining to the treatment of sewage and not in issue here, that the owner was to treat its effluent so as to remove the "nutrients" to a level that would comply with Special Standard "j" (See Glossary No. 11). Earlier permits issued by the BOARD had provided and stated, that "in lieu of upgrading to meet these requirements, the permitee may elect to connect to the Hampton Roads Sanitation District System. Subsequently the BOARD amended its permits; granted no alternatives, and directed the appellants to connect to HRSDC.

It was stipulated at the beginning of this trial that the nutrient values set forth in Special Standard "j", insofar as it applied to the "Nitrogen" level; that such level was impossible to achieve; and that there was no treatment system presently or potentially available capable of producing such results. The litigants were also in agreement, and stipulated, that the "Phosphorous" level contained in Special Standard "j" was economically and physically feasible and that such standard could and would be met by COUNTY/KEMPSVILLE.

Acknowledging such stipulation, the BOARD, in support of its order that COUNTY and KEMPSVILLE "hook–up" to HRSDC, argued as follows:

1. That Special Standard "j" had been adopted in the early sixties by the BOARD.

At some later date, learning of the impossibility of the achievement of such level, no attempt was made to enforce same until the adoption by Congress of Public Law 89–234 in 1965. BOARD'S counsel stated that this congressional act required certain minimum standards to be adopted and enforced by the respective states. Where, however, a state had previously adopted standards, stricter than the Federal Act, then the state was required to enforce the stricter of the standards.

2. The BOARD argued that although it had never before sought to enforce Special Standard "j", as it related to the nitrogen level because it was impossible to achieve, that now, by the mandate of federal law, it was required to do so. Therefore, impossible or not, the BOARD was now required to impose upon COUNTY/KEMPSVILLE the levels set forth in Special Standard "j".

3. Since this could not be complied with, the BOARD'S only alternative was to order COUNTY/KEMPSVILLE to "hook–up" to the HRSDC.

The opposition argument of COUNTY/KEMPSVILLE was as follows:

1. That in ordering standards that were impossible to meet, such contravened and exceeded the authority of the BOARD and the purpose of the Water Control Act as is set forth in § 62.1–44.4 of the Code of Virginia; hence the BOARD lacked the authority and power to enforce such requirements; and,

2. That the BOARD had no authority to order COUNTY/KEMPSVILLE to connect to HRSDC; and,

3. To allow the BOARD'S action in effect amounts to a confiscation of the owners' property without just compensation; hence, is contrary to both the United States and Virginia Constitutions.

Because of the multitude of pleadings contained in this proceeding, in the GLOSSARY reference therein will be found to an Order (Glossary No. 8) entered November 3, 1978, by Judge Robert S. Wahab, Jr. In this Order he ruled upon a motion by the BOARD for "Summary Judgment"; denying same and stating "it is the court's present view that an unlawful confiscation of property can occur if fee simple title is vested in the party whose property is subject to being confiscated and without regard to whether such party has already recovered its original capital investment."

Thereafter, the Order states those issues to be decided at trial, numbering such issues chronologically 1 thru 10 in said Order.

The Court's conclusions to the issues found in such Order, can be more accurately addressed and answered if I insert, at this point in my opinion, a photostatic copy of said Order; the same being herewith attached.

ORDER ON PRE-TRIAL CONFERENCE

On October 20, 1978 came the parties by counsel for a Pre–Trial Conference to clarify and restate the issues to be tried in the cause.

Before the Pre–Trial Conference began the Commonwealth asked leave to file a Motion for Summary Judgment on the ground that the Commonwealth can prove that neither County Utilities Corporation or Kempsville Utilities Corporation have any remaining, unrecovered capital investment in such treatment plants and, therefore, that said Utilities lack sufficient property interest in such Utility plants to complain of the confiscation of such treatment plants by the state; whereupon, the Court granted the Commonwealth oral motion for leave to file its Motion for Summary Judgment with brief within ten (10) days and further stated that it is the Court's present view that an unlawful confiscation of property can occur if fee simple title is vested in the party whose property is subject to being confiscated and without regard to whether such party has already recovered its original capital investment.

Following argument of counsel with respect to the statements of issues submitted by each party, the Court approved the following statement of issues:

1. Whether the Virginia State Water Control Board erred in applying, or is estopped from applying, Special Standard "j" as a present absolute and enforceable effluent limitation rather than as an objective or goal to be attained in the future when the state of the art may permit it to be technologically achievable and economically feasible.

2. Whether the December 8, 1977 decision of the State Water Control Board to issue NPDES permits Nos. VA00060691 and VA00060682 to County and Kempsville respectively, requiring County and Kempsville to connect their discharges to Hampton Roads Sanitation District Facilities, was based on § 62.1–44.19:1 of the Code of Virginia, and if so, (a) whether § 62.1–44.19:1, which singles out private and public sewage treatment utilities in the City of Virginia Beach for discharge termination without providing a uniform ter-

mination policy applicable to every point source discharging into every tidal estuary within the Commonwealth of Virginia is unreasonable, arbitrary, capricious, discriminatory or confiscatory in violation of Article I, § 11 of the Constitution of Virginia and Amendments V and XIV of the Constitution of the United States or is a Bill of Attainder or *Ex Post Facto* law violating Article I, § 10 of the United States Constitution and, (b) if said § 62.1–44.-19:1 is valid whether County Utilities Corporation and Kempsville Utilities Corporation are "polluting" within the meaning of said § 62.1–44.19:1.

3. Whether the decisions of the State Water Control Board of December 8, 1977 granting County Utilities Corporation and Kempsville Utilities Corporation NPDES permits requiring them to connect to Hampton Roads Sanitation District violate constitutional guarantees and are otherwise void because:

a) Such orders are arbitrary and capricious and therefore denials of due process of law guaranteed by Article I, § 11 of the Constitution of Virginia and Amendment XIV of the Constitution of the United States; or

b) Such orders are confiscatory and constitute a taking of property without just compensation and without due process of law contrary to Article I, § 11 of the Constitution of Virginia and Amendments V and XIV of the Constitution of the United States; or

c) Such orders are discriminatory and constitute a denial of equal protection of the laws contrary to Amendment XIV of the Constitution of the United States; or

d) Such orders are arbitrary, capricious or an abuse of discretion.

e) Such orders are in the nature of *Ex Post Facto* laws prohibited by Article I, § 10 of the Constitution of the United States.

4. Whether the decision of the State Water Control Board to issue NPDES permits requiring County Utilities Corporation and Kempsville Utilities Corporation to connect with Hampton Roads Sanitation District sewage treatment facilities constitutes an impairment of the obligation of their contract (their franchises including the sovereign power of eminent domain granted to them by the State Corporation Commission), in violation of Article I, § 11 of the Constitution of Virginia and Article I, § 10 of the Constitution of the United States.

5. Whether the Virginia State Water Control Board exceeded its statutory authority or jurisdiction to regulate sewage treatment plant effluent discharges into state waters by its decision of December 8, 1977 requiring County Utilities Corporation and Kempsville Utilities Corporation to connect their sewage treatment plant discharges to Hampton Roads Sanitation District facilities.

6. Whether the Board decision to issue NPDES permits to County Utilities Corporation and Kempsville Utilities Corporation, etc. was made upon unlawful procedure, i. e. whether the Virginia State Water Control Board erred in admitting into the record over the objection of County and Kempsville Utilities at the March 1977 and November 1977 Hearings, the record of a Hearing dated June 24, 1976 held *ex parte* without requisite notice, right to cross–examination and opportunity to be heard–contrary to the Constitution of the United States, the Constitution of the Commonwealth of Virginia and the Statutes and Rules of Procedure governing State Water Control Board Hearings–or erred in failing to permit any inquiry into the adoption, registration applicability and enforcement of Special Standard "j" and cross–examination with respect to same.

7. Whether the evidence of the facts and circumstances in the case considered as a whole fails to support the decision of the Virginia State Water Control Board to issue NPDES permits to County Utilities Corporation and Kempsville Utilities Corporation requiring them to connect them with Hampton Roads Sanitation District sewage treatment facilities.

8. Whether since the State Water Control Board classifies County Utilities Corporation and Kempsville Utilities Corporation as municipal dischargers, § 62.1–44.15:1 of the Code of Virginia requires the State Water Control Board to pay for the ordered connections to Hampton Roads Sanitation District.

9. Whether NPDES permit No. VA0060691, as reissued to petitioner County Utilities Corporation (hereinafter "County") by the respondent on December 8, 1977, and NPDES permit No. VA0060682, amended and reissued to petitioner Kempsville Utilities Corporation (hereinafter, "Kempsville") by the respondent on December 8, 1977, contain and assure compliance with applicable effluent limitations, including those necessary to meet water quality standards, treatment requirement, or schedules of compliance, established by the United States Environmental Protection Agency, pursuant to 33 U.S.C. §§ 1311 and 1312 and/or by the State Water Control Board pursuant to the State Water Control Law (§ 62.1–44.2 et seq. of the Code of Virginia (1950), as amended).

10. Any issue disclosed during discovery and further proceedings herein.

The Court hereby sets February 8, 1979, for the trial of this cause, and does further fix January 8, 1979, as the discovery cutoff date.

Enter:  11/3/78

Judge

Seen and exception noted as to Issue No. 9

(s) E. Leslie Cox

(s) Robert R. MacMillan

Attorneys for County Utilities Corporation and Kempsville Utilities Corporation

Seen and exceptions noted as to Issue No. 3(e).

T.G.H.

Attorney for State Water Control Board–State of Virginia

Further, my opinion will address the issues chronologically; using the identical system of numbering as is found in said Order.

1. Rather than become involved with the issue of "estoppel" since I find no application of the doctrine in this case, I conclude that the BOARD did err in applying Special Standard "j" as a criteria for any action it might propose to take against COUNTY/KEMPSVILLE. Having stipulated that the "Nitrogen" level was impossible to achieve, any action to enforce such is contrary to the BOARD'S functions and powers as are set forth in § 62.1–44.4 of the Code.

2. The question propounded here is whether § 62.1–44.19:1 of the Code (which is not found in Volume 9 of the Code, but instead in Volume 2 of the Acts of Assembly [Regular Session 1972] at page 1565) is unreasonable, arbitrary, capricious, discriminatory or confiscatory. Such Code section is designated "Chapter 840" and reads as follows:

> "Whenever the State Department of Health or the State Water Control Board determines that a receiving stream in Virginia Beach is being polluted by the sewage discharge from a private or public sewage utility, and that it is possible to connect such utility to the sewage system of a municipality, sewage treatment authority, or sanitation district, the Board is hereby empowered to order the utility in Virginia Beach to stop such discharge into the receiving stream. *The utility shall discontinue the said discharge either by adequate treatment as determined by the State Department of Health or Water Control Board, or by connection to central facilities, either of which is to occur within one year.*" (Emphasis Added.)

Subsection 2.(a) of this issue questions whether such action of the General Assembly is in violation of Article I, § 11 of the Constitution of Virginia and Amendments V and XIV of the United States Constitution.

I conclude that the act itself is not unconstitutional insofar as it applies solely to the city of Virginia Beach, because within such area it empowers the BOARD to act as to any such private or public sewage utility. As such it applies to all that would fall within the designated class, and hence, is not discriminatory.

In answer to 2.(b), it was not argued by the BOARD that COUNTY/KEMPSVILLE were "polluting" the waters into which they empty, and the evidence presented substantiates such conclusion. To the contrary the evidence clearly shows that their effluent is actually diluting the pollution level found in the respective waters.

The statute here involved (§ 62.1–44.19:1) required that the BOARD first determine that the *"receiving stream in Virginia Beach is being polluted by the sewage discharge from a private or public sewage utility . . ."* (Emphasis added.) Since there was no showing or contention that COUNTY/KEMPSVILLE were polluting such waters; this precondition not having been met, then the exercise of the "connection authority" does not arise. Therefore, I hold that the BOARD'S actions were invalid.

3.(a) The BOARD'S order requiring COUNTY/KEMPSVILLE to connect to HRSDC were arbitrary, unreasonable and capricious; the reasoning therefore being set forth in "2." (Supra)

In answer to subsection (b), I hold that the BOARD'S orders are and would be confiscatory and as such amount to an unconstitutional exercise of the BOARD's authority.

It should be here noted that there is no contention by COUNTY/KEMPSVILLE that the State lacks the power of condemnation of a duly franchised utility. The right of condemnation has not been granted to the BOARD by the State Water Control Act.

The answers to 3.(c) and (d) have been addressed previously, there being no reason to repeat such again.

In answer to 3.(e) I find, and so hold that such orders of the BOARD are ex post facto, but are not by reason thereof, invalid

or unlawful exercises of the power of the BOARD.

The franchise rights granted COUNTY/KEMPSVILLE are not immutable. Such franchises are conditional privileges; the State retaining the authority to revoke that which it has granted.

Forgetting for the moment the issues in this case of "hook–up" or "condemnation", the BOARD'S purpose under the act in found in § 62.1–44.4. Its powers and duties are set forth in § 62.1–44.15. Assuming, argumento, that a franchisee were "polluting" waters of the state; that such pollution could be abated by treatment physically and economically feasible, then the BOARD is empowered to have such franchise comply with its orders to abate such condition. Failing to do so, the BOARD then may revoke the franchisee's rights; this pursuant to § 62.1–44.15(5).

The State having such power it may and has in this area lawfully delegated such authority to the BOARD.

4. The question here raised is whether the BOARD'S order to COUNTY/KEMPSVILLE to connect to HRSDC constituted an impairment of the right of contract. Those contractual rights framed by this issue relate to the "franchise" granted COUNTY/KEMPSVILLE by the State as a sewage utility. Again, the court has to make reference to its previous findings; to–wit: (a) that there is no evidence nor claim that COUNTY/KEMPSVILLE is polluting the streams of Virginia Beach; therefore it becomes unnecessary to determine whether the provisions of § 62.1–44.-19:1 would in fact constitute an "impairment of the obligation of their contract"; but (b) assuming, argumento, that pursuant to § 62.1–44.4 of the Code, the BOARD had found that certain standards were economically and physically feasible to obtain; that COUNTY/KEMPSVILLE were ordered to meet such standards, but failed to do so, then the authority of the BOARD to cause such utility to cease operation would in effect terminate the franchise rights of the owner. This latter clearly would impair the rights of the franchise (contract) but never-

theless, it would be a legitimate and proper legal exercise of the authority of the BOARD.

5. The answer to this issue is "yes"; the reasons having been previously stated. They need not be further amplified.

6. This issue directs itself to the procedural aspect of the hearings and the admission of evidence before the BOARD. The record in this case; particularly the exhibits introduced are voluminous. Since a finding in favor of or against the BOARD on this issue will not change my ultimate resolution of the case before me, such would appear unnecessary.

I would, however, offer two conclusions, which appear from the evidence and from the reasonable inferences as may be drawn therefrom; they are:

(a) That the Water Control Board, upon the enactment by Congress of Public Law 89–234, but more particularly, with the passage of Public Law 92–500 found itself thrust and vaulted from a "sleeping" agency of government into the forefront of public interest, activity and scrutiny. The BOARD; its responsibilities and duties suddenly enlarged, then as with anyone or any agency must contend with enlarged duties and rapid expansion. When such occurs the time for deliberate and reasoned growth is missing. Fairness dictates that the BOARD should be granted a reasonable time to adopt and perfect its procedures.

My second conclusion goes to the inevitability of the present conflict. After studying EXHS. A–42 and A–47 and when these are considered along with other evidence, I submit that the BOARD, regardless of its proceedings would have reached the same conclusion and would have ordered COUNTY/KEMPSVILLE to "cease" treating and discharging, and to "connect" with HRSDC.

8. Since in answer to issues previously addressed the court has concluded that the order to "connect" is (a) beyond the scope of authority of the BOARD on the facts presented, and (b) is confiscatory; then the question of payment by the BOARD for such connections becomes moot. The

BOARD has not been granted the authority to condemn; hence this is a power reserved to the state.

9. The prior NPDES permits granted COUNTY/KEMPSVILLE to meet certain effluent standards are proper and in keeping with the requirements of the U. S. Environmental Protection Agency in all respects except as to the order to comply with the "nitrogen" level set forth in Special Standard "j".

10. This residual question deals with any findings from the trial as to issues not heretofore specifically stated. The following is my summation of evidence relevant to the present controversy, evidence that for all practical purposes has been either stipulated to or uncontested by the BOARD.

(1) When COUNTY and then KEMPSVILLE were established, such was done at the urging of the then leaders of Princess Anne County. Their purpose was to avert further pollution and to aid in removing the pollution that then existed in local waters. Prior to establishing either COUNTY or KEMPSVILLE, a valid attempt to have HRSDC provide for such collection and treatment was undertaken. EXHS. A–1 and A–2 were introduced to prove that HRSDC could not supply such service. Without such foresight, and the subsequent action of COUNTY/KEMPSVILLE pollution would have been increased by the use of individual septic tanks in meeting the demands of the rapid population and building growth that was then occurring in Princess Anne County.

(2) That prior to either of these two utilities being chartered, the respective waters into which they empty had already been judged as polluted by the Virginia Department of Health. At present, the condition of these waters had changed; the Eastern Branch of the Elizabeth River having "improved", and the Lynnhaven now being regarded as "safe".

(3) The BOARD, as to the nutrient levels set forth in Special Standard "j", has only tried to impose these levels on COUNTY/KEMPSVILLE; such not being re-quired of any other utility within the Commonwealth.

(4) That the POINT SOURCE of the Chesapeake–Elizabeth outfall of HRSDC is by pipe emptied into the Chesapeake Bay. This discharge point is 3500 feet from shore and extends outward from the location of Little Creek in Virginia Beach. The effluent from this discharge has, by tidal action, raised the nutrient levels in the Lynnhaven River.

Presently, by the "washing action" of tide changes and aided by the continuing dilution of the Lynnhaven from COUNTY such has not reached a dangerous level. The discharge by COUNTY thus, in actuality, presently reduces the adverse effects caused by the Chesapeake–Elizabeth outfall.

As to the Eastern Branch of the Elizabeth River, the evidence of nutrient levels is that the level at the Point Source of KEMPSVILLE is no greater than that found at other locations in such estuary. Three additional POINT SOURCES of HRSDC in the Norfolk–Portsmouth area are the primary cause of the nutrient levels as do exist therein.

And now having replied to all issues addressed to the court, I file this my opinion and request that it be adopted, by reference, in an order in keeping therewith, which I request counsel to prepare and submit to the court for entry.

A practical and physical result of my rulings and findings are as follows:

(1) The BOARD'S orders to connect to HRSDC are invalid and void.

(2) Any order of the BOARD, as it is contained in any permit, or other action of the BOARD, directing or seeking to require COUNTY/KEMPSVILLE to comply with the "nitrogen" level set forth in Special Standard "j" is or are invalid or void.

(3) Save and except for the above, the residue of the NPDES permits issued January 9, 1978, or previously, governing plant requirements and sewage treatment are to be complied with by COUN-

TY/KEMPSVILLE, and their rights thereunder, except where otherwise amended or altered, by agreement or lawful exercises of the BOARD, shall continue until June 30, 1982; the present expiration date of such permits.

Henry L. Lam
JUDGE

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH

COUNTY UTILITIES CORPORATION,

    Appellant-Petitioner,

v.

COMMONWEALTH OF VIRGINIA,
STATE WATER CONTROL BOARD,

    Appellee-Respondent.

:    THIS _8_ DAY OF _Jun_ 1979

:

:    AT LAW NO. L–4139 – APPEAL

:

:

:

:

---

## FINAL DECREE

THIS DAY came the parties, by counsel, on the Notice of Appeal by County Utilities Corporation from actions of the Virginia State Water Control Board of December 8, 1977, incorporated in an Order of the State Water Control Board dated December 9, 1977; on the record of the public hearing held on June 24, 1976; on the record of the public hearing held on March 4, 1977; on the record of the public hearing held on November 16, 1977; on the record of the State Water Control Board's meeting of December 7, 8 and 9, 1977; on the Findings of Fact and Conclusions of Law of the State Water Control Board dated December 9, 1977; on the memorandum of David S. Bailey dated December 8, 1977; and on the transcript of the State Water Control Board meeting of December 7, 8 and 9, 1977; on Minute 29 of the State Water Control Board of December 7 through 9, 1977; on National Pollution Discharge Elimination System Permit No. VA 0060691 issued January 9, 1978; and the revocation of Discharge Certificate No. 1007 issued May 8, 1956; on the Petition for Appeal filed by the Appellant; on the Answer filed by the Commonwealth of Virginia, State Water Control Board; on the evidence heard *ore tenus* on February 8, 9, 12 and 13, 1979; and on the memorandum of law and arguments of counsel, and

Upon the grounds and for the reasons stated by the Court in its Opinion of April 5, 1979, which Opinion is incorporated herein by reference, the Court doth pursuant to § 62.1 -44.29 Code of Virginia (1950) as amended, ORDER, ADJUDGE and DECREE that:

1. The State Water Control Board's Special Standard "j" objective for Nitrogen removal to a level of 0.5 milligram per liter of sewage treatment plant effluent is neither technologically achievable nor economically feasible, and, therefore, is void and unenforceable.

2. The State Water Control Board's Orders of December 8 and 9, 1977, enforcing compliance by County Utilities Corporation with the physically and economically unattainable Special Standard "j" 0.5 milligram per liter nitrogen effluent limitation were beyond the Board's statutory authority.

3. The Virginia State Water Control Board NPDES Permit decisions of December 8 and 9, 1977, requiring County Utilities Corporation to connect its Birchwood Gardens sewage treatment plant discharge to central sewage facilities were beyond the Board's statutory authority.

4. The decisions of the State Water Control Board taken at its meeting on December 8 and 9, 1977, were unreasonable, arbi-

trary, capricious, confiscatory, unconstitutional and void.

5. County Utilities Corporation's NPDES Permit No. VA 0060691 issued January 9, 1978, effective November 15, 1976, is hereby modified as shown by the Permit, a copy of which is attached and made a part hereof, and said NPDES Permit as modified shall remain in full force and effect until June 30, 1982, unless it be altered or amended by agreement of the parties or the lawful exercises of the State Water Control Board.

6. The Appellant, County Utilities Corporation, shall recover its costs and expenses in this proceeding.

ENTER:

_____
Judge

We ask for this:

_____
Counsel for Appellant

_____
Counsel for Appellant

Seen and Objections Noted:

_____
Assistant Attorney General

# COMMONWEALTH *of* VIRGINIA

## *STATE WATER CONTROL BOARD*
### *2111 Hamilton Street*

| | |
|---|---|
| Permit No. | VA0060691 |
| Effective Date | November 15, 1976 |
| Reissuance Date | June 30, 1977 |
| Expiration Date | June 30, 1982 |

VA–SWCB–A    AUTHORIZATION TO DISCHARGE UNDER THE
NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
AND
THE VIRGINIA STATE WATER CONTROL LAW

1. In compliance with the provisions of the Federal Water Pollution Control Act, as amended, (33 U.S.C. 1251 *et seq.*; the "Act"), and pursuant to Section 62.1–44.2 *et seq.* of the Code of Virginia, of 1950, as amended, and regulations adopted pursuant thereto, and the Final Decree of the Virginia Beach Circuit Court (L–4139–Appeal) County Utilities Corporation

   is authorized to discharge from a facility located at Birchwood Gardens Plant, North of Harton Road, City of Virginia Beach

   to receiving waters named Buchanan Creek, Tributary of the Lynnhaven River

   in accordance with the effluent limitations, monitoring requirements, and other conditions specified herein and set forth in Parts I and II of this permit, as modified by the Final Decree of the Circuit Court of the City of Virginia Beach, Virginia in *County Utilities Corporation* v. *Commonwealth of Virginia, State Water Control Board* (L–4139–Appeal)

2. The sewage treatment works shall be constructed in accordance with plans and specifications approved by the State Department of Health by letter of January 23, 1956 and by the State Water Control Board in Minute 31 of its meeting on January 26–27, 1956 and by memorandum dated                    , approved in accordance with Minute 7 from the proceedings of the Board at its June 10–11, 1974 meeting.

3. The approval of plans and specifications does not relieve the permittee of the responsibility of operating the facility in a reliable and consistent manner to meet the facility performance requirements in the permit. If facility deficiencies, design and/or

operational, are identified in the future which could affect the facility performance or reliability, it shall be the responsibility of the permittee to correct such deficiencies forthwith as may be directed by the State Water Control Board.

/s/ R. V. Davis
Executive Secretary, State Water Control Board

JAN 09 1978

WCB D     These effluent limits (page 1 of 4) ~~expire June 30, 1977~~

PERMIT NO. VA0060691
Page 1 of     4

PART I

EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

1. During the period beginning with the permit's effective date ~~and lasting until completion of facilities covered in Part I.B.5,~~ the permittee is authorized to discharge from outfall(s) serial number(s) 001

Such discharges shall be limited and monitored by the permittee as specified below:

| EFFLUENT CHARACTERISTIC | | DISCHARGE LIMITATIONS | | | | MONITORING REQUIREMENTS | |
|---|---|---|---|---|---|---|---|
| | Average Quantity | Monthly Average Concentration | Weekly Average Concentration | Instantaneous Limitation Min. | Max. | Frequency | Sample Type |
| Flow (MGD) * | - - | - - | - - | - - | - - | Daily | - - - - |
| BOD$_5$ | 91 (200) Kg/d(1b/d) | 30  mg/1 | 45  mg/1 | - - | - - | 3/week | 8-Hr. composite |
| Suspended Solids | 151 (334) Kg/d(1b/d) | 50  mg/1 | 75  mg/1 | - - | - - | 3/week | 8-Hr. composite |
| Cl$_2$ Residual (mg/1) (2) | - - | - - | - - | - - | - - | Daily | Grab |
| pH (standard units) | - - | - - | - - | 6.0 | 9.0 | Daily | Grab |
| Fecal Coliform (N/100 ml) | - - | 200 | 400 | - - | - - | 3/week | Grab |

2. (a) No more than 27 of all total chlorine residual analyses shall be outside the range 1.5 through 2.5 milligrams per liter for any one calendar month.

   (b) Any 2 consecutive test results not within the range 1.0 through 3.5 milligrams per liter shall be immediately reported in accordance with paragraph B(4)(a).

3. There shall be no discharge of floating solids or visible foam in other than trace amounts.

4. Samples taken in compliance with the monitoring requirements specified above shall be taken at the following location(s):   P.S. 001

* The design flow of this treatment facility is .8 MGD.  The permittee shall monitor flow as specified above (See the Board policy for Sewage Treatment Plant Loadings adopted May 12, 1971).

B.  Monitoring and Reporting

1. *Sampling and Analysis Methods*

a.  Samples and measurements taken as required herein shall be representative of the volume and nature of the monitored discharge.

b.  The sampling and analysis program to demonstrate compliance with the permit shall conform to Paragraph A.1 above.

c.  The permittee shall record for all samples the date and time of sampling, the sampling method used, the date analyses were performed, the identity of the analysts, and the results of all required analyses and measurements.

d. Test procedures for the analysis of pollutants shall conform to regulations published pursuant to Section 304(g) of the Act, under which such procedures may be required.

e. The permittee shall periodically calibrate and perform maintenance procedures on all monitoring and analytical instrumentation at intervals to insure accuracy of measurements.

f. All records and information resulting from the monitoring activities required by this permit including all records of analyses performed and calibration and maintenance of instrumentation and recordings from continuous monitoring instrumentation shall be retained for a minimum of three (3) years, or longer during the course of any unresolved litigation or when requested by the Board.

2. *Additional Monitoring by Permittee*

If the permittee monitors any pollutant at the location(s) designated herein more frequently then required by this permit, using approved analytical methods as specified above, the results of such monitoring shall be included in the calculation and reporting of the values required in the Discharge Monitoring Report. Such increased frequency shall also be indicated.

3. *Water Quality Monitoring*

The permittee shall obtain and record such information on the receiving waters and such other State waters as requested by the Board. Such information shall be subject to inspection by authorized State and Federal representatives and shall be submitted with such frequency and in such detail as to be satisfactory to the Board.

4. *Reporting Requirements*

a. If, for any reason the permittee does not comply with any effluent limitation specified in this permit, or should any unusual or extraordinary discharge * of wastes occur from the facilities herein permitted, the permittee shall immediately notify the State Water Control Board by telephone and provide the Board with the following information in writing, within five (5) days of such notification:

1. A description of the non–complying discharge including its impact upon the receiving waters.

2. Cause of non–compliance.

3. Anticipated time the condition of non–compliance is expected to continue, or if such condition has been corrected, the duration of the period of non–compliance.

4. Steps taken by the permittee to reduce and eliminate the non–complying discharge.

5. Steps to be taken by the permittee to prevent recurrence of the condition of non--compliance.

* (See Water Control Board Regulation Number 4)

b. The permittee shall submit to the State Water Control Board, at the addresses listed below, by the 10th of each month a National Pollutant Discharge Elimination System Discharge Monitoring Report of the plant's performance in accordance with Attachment A. In addition, a monthly report covering the plant's general operational data may be required.

State Water Control Board
Tidewater Regional Office
Pembroke # 2 Suite 310
Independence Boulevard
Virginia Beach, Virginia 23462

State Water Control Board
Bureau of Applied Technology
Post Office Box 11143
Richmond, Virginia 23230

A. *MANAGEMENT REQUIREMENTS*

1. *Change in Discharge*

All discharges authorized herein shall be consistent with the terms and conditions of this permit. The discharge of any pollutant more frequently than, or at a level in excess of, that identified and authorized by this permit shall constitute a violation of the terms and conditions of this permit. Such a violation may result in the imposition of civil and/or criminal penalties as pro-

vided for in Section 309 of the Act. Any anticipated change in the facility discharge, including any new significant industrial discharge or significant changes in the quantity or quality of existing industrial discharges to the treatment system that will result in new or increased discharges of pollutants must be reported to the permitting authority. Modifications to the permit may then be made to reflect any necessary changes in permit conditions, including any necessary effluent limitations for any pollutants not identified and limited herein. In no case are any new connections, increased flows, or significant changes in influent quality permitted that will cause violation of the effluent limitations specified herein.

2. *Facility Operation and Quality Control*

All waste collection, control, treatment and disposal facilities shall be operated in a manner consistent with the following:

a. At all times, all facilities shall be operated as efficiently as possible and in a manner which will minimize upsets and discharges of excessive pollutants.

b. The permittee shall provide an adequate operating staff which is duly qualified to carry out the operation, maintenance and testing functions required to insure compliance with the conditions of this permit.

c. Maintenance of treatment facilities shall be carried out in such a manner that effluent quality requirements are not violated.

d. Collected screenings, slurries, sludges, and other solids shall be disposed of in such a manner as to prevent entry of those wastes (or runoff from the wastes) into State waters or their tributaries.

3. *Adverse Impact*

The permittee shall take all reasonable steps to minimize any adverse impact to State waters resulting from non-compliance with any effluent limitations specified in this permit, including such accelerated or additional monitoring as necessary to determine the nature and impact of the non-complying discharge.

4. *Power Failure*

The permittee is responsible for maintaining adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during power failures in accordance with the requirements of Section 2.02 of the Virginia Sewerage Regulations.

5. *Structural Stability*

The structural stability of any of the units or parts of the facilities herein permitted is the sole responsibility of the permittee and the failure of such structural units or parts shall not relieve the permittee of the responsibility of complying with all terms and conditions of this permit.

B. *RESPONSIBILITIES*

1. *Right of Entry*

The permittee shall allow authorized State and Federal representatives, upon the presentation of credentials:

a. to enter upon the permittee's premises where an effluent source is located or in which any records are required to be kept under the terms and conditions of this permit;

b. to have access to and copy at reasonable times any records required to be kept under the terms and conditions of this permit;

c. to inspect at reasonable times any monitoring equipment or monitoring method required in this permit; or,

d. to sample at reasonable times any discharge of pollutants.

2. *Transfer of Ownership or Control*

This permit cannot be transferred or assigned, nor shall a new owner or suc-

cessor be authorized to discharge from this facility until the following requirements are met:

a. The permittee shall notify the succeeding owner or successor of the existence of this permit by a letter before transfer of the facility, a copy of which shall be forwarded to the Board.

b. The new owner or successor shall submit a letter to the Board stating that he will comply with the requirements of the permit on this facility and receive confirmation and approval of the transfer from the Board.

3. *Permit Modification and Revocation*

In accordance with the Board's Regulation 6, this permit may be modified or revoked in whole or in part during its term for cause including, but not limited to, the following:

a. violation of any terms or conditions of this permit;

b. obtaining this permit by misrepresentation or failure to disclose fully all relevant facts; or,

c. a change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

4. *Toxic Pollutants*

Notwithstanding Part II, B.4 above, if a toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is established under Section 307(a) of the Act for a toxic pollutant which is present in the discharge and such standard or prohibition is more stringent than any limitations for such pollutant in this permit, this permit shall be revised or modified in accordance with the toxic effluent standard or prohibition and Section 62.1–44.15(5) of the Code of Virginia (1950) as amended.

5. *Civil and Criminal Liability*

Nothing in this permit shall be construed to relieve the permittee from any sanctions for non–compliance under the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C. 1251 *et seq.*).

6. *Oil and Hazardous Substance Liability*

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject under Section 311 of the Act.

7. *State Laws*

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable State law or regulation under authority preserved by Section 510 of the Act.

8. *Property Rights*

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws or regulations.

9. *Severability*

The provisions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstances is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.

374

ATTACHMENT A

SWCB-R                    COMMONWEALTH OF VIRGINIA

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
MUNICIPAL DISCHARGE MONITORING REPORT

Facility Name:
Address:

General Instructions
1. Submit to State Water Control Board Regional Office and Bureau of Applied Technology within 10 days after the end of each monthly report period.
2. You are advised to retain a copy of this report for your records.
3. NG/DAY = concentration (MG/L) x flow (MGD) x 3.785.

Permit Number: $\underline{V}$ $\underline{A}$ $\underline{0}$ $\underline{0}$ $\underline{6}$ $\underline{0}$ $\underline{6}$ $\underline{9}$ $\underline{1}$     (1–9)

4. Do not enter values in shaded boxes.

Discharge Number: $\underline{0}$ $\underline{0}$ $\underline{1}$     (10–12)

5. A complete reporting instruction package is available from the State Water Control Board Regional Office.

Reporting Period: From   /   /     (13–18)
                  To     /   /     (19–24)

| Parameter (25–27) | | Average Quantity (28–35) | Units (35–37) | Concentration (33–45) Minimum | (45–53) Average | (54–51) Maximum | (62–63) Units | No. Ex. | Frequency of Sample (64–66) | Sample Type (67) |
|---|---|---|---|---|---|---|---|---|---|---|
| Flow 001 | reported | — — — | MGD 04 | | | | | | | |
| | permit condition | 0.8 | | | | | | | daily | |
| pH 002 | reported | | | — — — | — — — | — — — | Std. Units | | | |
| | permit condition | | | 6.0 | | 9.0 | | | daily | grab |
| BOD$_5$ 003 | reported | — — — | KG/DAY 07 | | — — — | — — — | MG/L 01 | | | |
| | permit condition | 91 | | | 30 | 45 | | | 3/week | 8 Hr.C. |
| Suspended Solids 004 | reported | — — — | KG/DAY 07 | | — — — | — — — | MG/L 01 | | | |
| | permit condition | 151 | | | 50 | 75 | | | 3/week | 8 Hr.C. |
| Fecal Coliform 006 | reported | | | | — — — | — — — | N/100 ML 05 | | | |
| | permit condition | | | | 200 | 400 | | | 3/week | grab |
| Cl$_2$ Residual 005 | reported | | | — — — | — — — | — — — | MG/L 01 | | | |
| | permit condition | | | 1.5 | | 2.5 | | 27 | daily | grab |
| Dissolved Oxygen (when applicable) 007 | reported | | | — — — | | | MG/L 01 | | | |
| | permit condition | | | 5.5 | | | | | daily | grab |
| ———— (Nutrient, when applicable) | reported | — — — | KG/DAY 07 | | — — — | | MG/L 01 | | | |
| | permit condition | | | | | | | | | |
| ———— (Nutrient, when applicable) | reported | — — — | KG/DAY 07 | | — — — | | MG/L 01 | | | |
| | permit condition | | | | | | | | | |

| By-Passes and Overflows | | | |
|---|---|---|---|
| | Total Occurrences | Total Flow By-Passed MG | Total KG BOD$_5$ By-Passed |
| Last Month | | | |
| From To (Last 3–Months) | | | |
| From To (Last 12–Months) | | | |

Name of Principal Executive Officer or Authorized Agent , Title

I certify that I am familiar with the information contained in this report and that to the best of my knowledge and belief such information is true, complete, and accurate.

Signature of Principal Officer or Authorized Agent , Date

Signature of Chief Operator in Responsible Charge , Operator's Certificate No.