UNITED STATES of America, Plaintiff,

v.

OLIN CORPORATION, Defendant.

Floyd WILHOITE, et al., Plaintiffs,

v.

OLIN CORPORATION, a corporation; and United States of America, Defendants.

Civ. A. Nos. CV80–PT–5300–NE, CV84–PT–1194–S.

United States District Court, N.D. Alabama, Northeastern and Southern Division.

April 4, 1985.

Fournier J. Gale, III & Frank D. McPhillips, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, Ala., for plaintiffs Wilhoite, et al.

Kenneth A. Reich, Dept. of Justice, Environmental Enforcement Sect., Washington, D.C., for the U.S.

G. Lee Garrett, Jr., Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for defendant Olin.

## MEMORANDUM OPINION

PROPST, District Judge.

Olin Corporation (hereinafter referred to as "Olin") is a Virginia corporation with its principal office and place of business in Connecticut. It is qualified to do business in Alabama. From approximately 1947 to 1971, Olin leased Redstone Arsenal from the United States in order to operate a plant for the manufacture and use of chemicals.[1] Plaintiffs are citizens of the State of Alabama who allege injury from the operation of the chemical plant.

This matter is before the court on a Motion for Summary Judgment filed by Olin on June 11, 1984. On July 9, 1979, the first complaint was filed in a line of cases [2] encompassing the subject matter of the instant case. In these cases, which were later consolidated, the State of Alabama and the United States sought injunctive relief to require Olin to eliminate DDT from, and restore the environment in, the vicinity of Redstone Arsenal. In paragraphs 17–20 of the United States' First Amended Complaint and paragraph A.1 of

---

1. For the sake of simplicity, these chemicals will be referred to as DDT.

2. *Cloud v. Olin,* CV79–PT–5128–NE (filed July 9, 1979) was followed by *Alabama ex rel. Graddick v. Olin,* CV79–PT–5174–NE (filed September 10, 1979), *Freeman v. Olin,* CV80–PT–5057–NE (filed March 14, 1980), *Parcus v. Olin,* CV80–PT–5098–NE (removed April 23, 1980), *United States v. Olin,* CV80–PT–5300–NE (filed December 4, 1980), *Charest v. Olin,* CV83–PT–5115–NE (removed February 28, 1983).

its prayer for relief, the following relief was requested against Olin:

A. Entry of a mandatory permanent injunction requiring Olin to do the following:

1. Take all appropriate and necessary remedial measures to restore the environment at RSA and in the vicinity of RSA including Wheeler Wildlife Refuge and the Tennessee River to its original condition prior to the manufacturing and disposing of DDT at RSA, including removal of DDT wastes and restocking Huntsville Spring Branch, Indian Creek, the Tennessee River and Wheeler National Wildlife Refuge with the fish, birds and other wildlife.

In the prayer for relief in Alabama's Amended Complaint, it requested that the court:

1. Order Defendant to take, at its own expense, all steps necessary to eliminate the public nuisance created by the presence of DDT pollution in the waters, water bottoms, aquatic life, and wildlife of Huntsville Spring Branch, Indian Creek, the Tennessee River, and the Wheeler Wildlife Refuge.

As part of the resolution of the consolidated DDT cases, Olin, the United States, and Alabama entered into a consent decree. Prior to final approval and entry of the consent decree, the settlement of the consolidated cases received widespread publicity throughout the Huntsville-Decatur, Alabama area. The consent decree and related documents were made available for public comment. The Justice Department, as required by 28 C.F.R. § 50.7, announced the proposed settlement on April 15, 1983, in 48 Fed.Reg. 16359 (April 15, 1983). The announcement indicated the public availability of the consent decree and related settlement documents and invited public comment on the proposed settlement for a thirty-day period.

Following the thirty-day comment period, the court held hearings concerning the proposed consent decrees and heard witnesses testify concerning the requirements set forth in the consent decree and its reasonableness. After the hearings, the court entered the consent decree on May 31, 1983.

The consent decree set forth a plan to collect, analyze and evaluate data to develop and implement a remedial program. The plan established a performance standard for the DDT level in certain fish species, required the performance of investigative programs to study fish, *in situ* sediment, suspended sediment transport, and water characteristics. In addition, Olin was required to develop a remedial program consistent with comprehensive goals and objectives.

Prior to and following entry of the consent decree, Olin began to conduct studies in the area, employed individuals to work on the project, and has expended substantial sums of money in meeting its obligations under the consent decree and proposal. Further, Olin has had meetings with, and has submitted quarterly reports to, the review panel, established by the consent decree, to report its progress.

On January 11, 1983, plaintiffs filed a separate action for damages.[3] In September 1983, plaintiffs first amended their complaint to demand injunctive relief, which was subsequently amended as follows:

[P]laintiffs demand preliminary and final injunctive relief to require defendant Olin to remove any and all DDT and other contaminants on and in T.V.A. Property, Huntsville Spring Branch, Indian Creek, Wheeler National Wildlife Refuge, and the Tennessee River, immediately and in no event more than one year after the date of the Court Order and to

---

3. This was shortly after the court had conducted a settlement conference and after considerable publicity had been given to the fact that there was a proposed settlement whereby substantial sums would be paid to private plaintiffs. Apparently these plaintiffs did not consider suing earlier although one of the private plaintiff cases had been pending since 1979 and all of the DDT had been produced by 1971.

require such other action by said defendant as the Court shall deem appropriate. The injunctive facet of the case [4] was severed, transferred to this court, and consolidated with the other *Olin* cases before the court by order of May 10, 1984.

Olin premises this motion, which is directed solely against the severed injunctive claim, on three arguments:

1. The actions brought by the United States and Alabama in the consolidated DDT cases were *parens patriae* actions, and the doctrine of res judicata bars the Wilhoite plaintiffs' injunctive claims.

2. The *Whilhoite* plaintiffs injunctive claims constitute an impermissible collateral attack on the consent decree entered in the consolidated DDT cases.

3. The *Wilhoite* plaintiffs' injunctive claims are untimely and barred by laches.

### I

Olin argues that because Alabama and the United States brought a *parens patriae* action on behalf of its citizens, subsequent suits by individual citizens are barred by res judicata.

■ In order for res judicata to have a preclusive effect on subsequent actions, the following elements must be met:

(1) that the prior judgment must have been rendered by a court of competent jurisdiction;

(2) that there must have been a final judgment on the merits;

(3) that the parties, or those in privity with them, must be identical in both suits; and

(4) that the same cause of action must be involved in both suits.

*Ray v. Tennessee Valley Authority,* 677 F.2d 818, 821 (11th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983), *quoting Stevenson v. International Paper Co.,* 516 F.2d 103, 108 (5th Cir.1975).

■ Plaintiffs cite several cases for the proposition that private plaintiffs are not barred from bringing a private enforcement action even though their interests were purportedly advanced by the United States in previous litigation that resulted in a consent decree, but plaintiffs cite no cases involving a prior *parens patriae* action. The weight of authority indicates that once a state represents all of its citizens in a *parens patriae* suit, a consent decree or final judgment entered in such a suit is conclusive upon those citizens and is binding upon their rights. *Badgley v. City of New York,* 606 F.2d 358 (2d Cir.1979), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 855 (1980); *Menzel v. County Utilities Corp.,* 501 F.Supp. 354 (E.D.Va. 1979).

■ Emphasizing that res judicata requires that there be a final judgment on the merits, plaintiffs assert that the consent decree of the prior litigation was merely a court-approved contractual settlement between the parties to that litigation and that the prior litigation did not result in a final judgment on the merits. The Eleventh Circuit, in a civil rights context, has stated the following:

The principles of res judicata and collateral estoppel apply to consent decrees as well as to ordinary judgments entered by a court. These doctrines prevent the attack of a prior judgment by parties to the proceedings or by those with sufficient identity of interests with such parties that their interests are deemed to have been litigated in those proceedings. A final judgment may not, however, bind a nonparty when his interests were not represented; thus, situations can arise where a judgment must not be applied to him. There are, additionally, limitations on the extent to which a nonparty can undermine a prior judgment. A nonparty may not reopen the case and relitigate the merits anew; neither may he destroy the validity of the judgment between parties.

In applying these principles to consent decrees, some courts have raised a spector that any action having a burden, financial or otherwise, on a consent decree

---

4. The original damage claim bears the case number CV83–C–5021–NE.

is an "impermissible collateral attack" on the decree. We do not follow this path to the extent that it deprives a nonparty to the decree of his day in court to assert the violation of his civil rights. (footnotes omitted).

*United States v. Jefferson County,* 720 F.2d 1511, 1517–18 (11th Cir.1983). In a proper *paren patriae* action, a state is deemed to represent all of its citizens, when the state is a party in a suit involving a matter of sovereign interest, and there is a presumption that the state will adequately represent the position of its citizens. *Menzel,* 501 F.Supp. at 357.

Plaintiffs argue that the consent decree by its own language mandates a denial of defendant's motion. Paragraph 46 of the consent decree provides that it does not "have any effect upon rights of persons or entities not parties to this consent decree." Plaintiffs assert that they are not barred by res judicata because they were neither parties to the consent decree entered in the earlier litigation nor in privity with the parties to the consent decree. Resolution of these arguments turn on whether the prior litigation was in fact a *parens patriae* suit and whether the *Wilhoite* plaintiffs, as citizens of Alabama and the United States, are unnamed parties or privies within in the meaning of that doctrine.[5]

In a proper *parens patriae* suit, the state or federal government is deemed to represent all of its citizens. *New Jersey v. New York,* 345 U.S. 369, 373, 73 S.Ct. 689, 691, 97 L.Ed. 1081 (1953).

The principle is a necessary recognition of sovereign dignity, as well as a working rule for good judicial administration. Otherwise, a state might be judicially impeached on matters of policy by its own subjects, and there would be no practical limitation on the number of citizens, as such, who would be entitled to be made parties.

*Id.*

In a recent case, the Supreme Court analyzed the *parens pariae* doctrine in assessing whether a state had standing to sue on behalf of all of its citizens:

This summary of the case law involving *parens patriae* actions leads to the following conclusions. In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, *i.e.,* the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case by case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract—certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being— both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 3269, 73 L.Ed.2d 995 (1982). "A State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens." *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 2336, 49 L.Ed.2d 124 (1976). Traditionally, *parens patriae* lawsuits involved a government suing to enjoin alleged nuisances caused by water or air pollution. *Alfred L. Snapp & Son, Inc.,* 458 U.S. at 602, 102 S.Ct. at 3266. *See also* Annot., 42 A.L.R.Fed. 23 (1979 & Supp. 1984).

[T]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their for-

---

5. Interestingly, while denying that the *parens patriae* doctrine applies, in their argument against the application of laches, plaintiffs ar-

gue that they did rely on the United States to properly represent their interests.

ests and its inhabitants shall breathe pure air. It might have to pay individuals before it could utter that word, but with it remains the final power. . . .

. . . When the States by their union made the forcible abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining *quasi*-sovereign interests.

*Alfred L. Snapp & Son, Inc.*, 458 U.S. at 604, 102 S.Ct. at 3267 *quoting Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907).

Plaintiffs argue that Alabama was, at most, a nominal party in the earlier litigation because the negotiations in that suit were conducted by Olin and federal officials, Alabama having no significant role in the environmental case. However, upon examining the facts, the court notes that although Olin and federal officials negotiated the consent decree, Alabama was kept abreast of these negotiations and fully approved the contents of the consent decree.[6]

Plaintiffs further urge that in the earlier litation, Alabama could not fully protect its citizens' interest because a state does not have standing to bring a *parens patriae* suit against the federal government. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 610 n. 16, 102 S.Ct. at 3270 n. 16. Although the court in *Massachusetts v. Mellon*, 262 U.S. 447, 485–86, 43 S.Ct. 597, 600–01, 67 L.Ed. 1078 (1923) held that a state may not bring a *parens patriae* action against the federal government in cases asserting the unconstitutionality of a federal statute or act, whether the same principles apply in instances of non-constitutional challenges is not answered in *Mellon*. Later cases have revealed that states are allowed to bring actions against the federal government or its agencies.[7] *Washington Utilities and Transportation*

*Commissions v. F.C.C.*, 513 F.2d 1142, 1153 (9th Cir.1975), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *Florida v. Weinberger*, 492 F.2d 488 (5th Cir. 1974). One writer has suggested that courts should grant *parens patriae* standing to states in suits against federal agencies where the state establishes a quasi-sovereign interest, poses no challenge to congressional policy-making authority, and does not attempt to invoke the original jurisdiction of the Supreme Court. Comment, *Federal Jurisdiction: State Parens Patriae Standing in Suits Against Federal Agencies*, 61 Minn.L.Rev. 691, 701–04 (1977). Moreover, plaintiffs make no suggestion that Alabama was under any legal impediment to enforce and protect the rights of its citizens against Olin or to make such a claim in consolidated cases wherein the United States is a party.

Plaintiffs also claim that the United States' conflict of interest in the earlier litigation precludes any argument that the government was acting in a legitimate *parens patriae* role. As evidence of this assertion, plaintiffs offer the fact that the United States obtained releases for itself and its agencies from parties whose interests it supposedly represented. Also, United States Attorneys represented various agencies of the government.

In *Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) an action to determine water rights, intervening Indian Tribes challenged the binding effect of prior litigation based upon alleged conflicts in the government's representation of their interests. The court held:

We find no merit in the Tribes' contention that the United States' representation of their interests was inadequate whether because of a claimed conflict of interests arising from the government's interest in securing water rights for other federal property, or otherwise. The United States often represents varied interests in litigation involving water

---

6. Attorney(s) for the State attended all hearings.

7. Plaintiffs argue that because this case involves intrastate rather than interstate pollution, many of the considerations supporting a *parens patriae* action are absent. The court is not persuaded that this distinction is dispositive.

rights, particularly given the large extent and variety of federal land holdings in the West. *See e.g. Colorado River Water Cons. District v. United States,* 424 U.S. [800] at 805 [96 S.Ct. 1236, at 1240, 47 L.Ed.2d 483 (1976)]. The Government's representation of these varied interests does not deprive our decision of finality.

*Id.* at 627, 103 S.Ct. at 1396.

In analyzing issues concerning consent decrees negotiated between the federal government and representatives of local governments settling suits alleging a "pattern or practice" of employment discrimination, the Fifth Circuit affirmed the lower court's approval of a consent decree and noted that:

> Unlike the situations in which we fear that a party may be attempting the profit at the expense of unrepresented individuals, *e.g.,* class actions and shareholder derivative suits, we here have as plaintiff the government department charged with seeing that the laws are enforced. We therefore need not fear that the pecuniary interests of the plaintiff and defendant will tempt them to agree to a settlement unfair to unrepresented persons, but can safely assume that the interests of all affected have been considered.

*United States v. City of Miami, Fla.,* 614 F.2d 1322, 1332 (5th Cir.1980) (footnotes omitted).

One appellate court has stated the rule regarding intervention in a *parens patriae* action which is equally appropriate in the instant case:[8]

> An individual seeking intervention ordinarily is required to make only a minimal showing that representation of his interest may be inadequate. Under the *parens patriae* concept, however, a state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens. Thus, to intervene in a suit in district court in which a state is already a party, a citizen or subdivision of that state must overcome this presumption of adequate representation. A minimal showing that the representation may be inadequate is not sufficient. The applicant for intervention must demonstrate that its interest is in fact different from that of the state and that that interest will not be represented by the state.

*Environmental Defense Fund, Inc. v. Higginson,* 631 F.2d 738, 740 (D.C.Cir. 1979). Although plaintiffs have come forward with facts in an attempt to show the United States' conflicts of interest, *see* Affidavit of Frank D. McPhillips, they have not met the above standard, nor have they shown any lack of diligence on the part of the United States in prosecuting the prior actions against Olin. The court has considered, *in camera,* evidence regarding the conflict of interest issue. *See* II, *infra.* Moreover, plaintiffs have not come forward with any facts to show fraud, collusion or conflict on the part of the State of Alabama.

■ Plaintiffs are correct in their assertion that Alabama law would permit individual plaintiffs to bring an action seeking injunctive relief for abatement of a public nuisance. *Monsanto Chemical Co. v. Fincher,* 272 Ala. 534, 133 So.2d 192 (1961). Alabama statutory law is in accord: "If a public nuisance causes a special damage to an individual in which the public does not participate, such special damage gives a right of action." Ala.Code § 6–5–123 (1975). Note, however, that the right accrues only to an individual plaintiff who can show harm distinct in kind and degree from that suffered by the public in general. *Barnes v. Kent,* 292 Ala. 508, 296 So.2d 881 (1974). Plaintiffs have not made such a showing.

■ Moreover, it is also clear that a private citizen has no action to enjoin a nuisance where an action has already been brought on behalf of the state. *Walls v.*

---

**8.** Cases involving intervention are particularly apropos in that if intervention would have been improper, it would be illogical to allow a separate suit, absent special factors.

*C.D. Smith & Co.*, 167 Ala. 138, 142, 52 So. 320, 321 (1910). "Were it otherwise, suits might be multiplied to an indefinite extent, so as to create a public evil, in many cases much greater than that which was sought to be redressed." *Duy v. Alabama Western Railroad Co.*, 175 Ala. 162, 184, 57 So. 724, 731 (1911) (Mayfield, J., dissenting).

■ By suing to eliminate the alleged public nuisance created by the presence of DDT pollution which was alleged to have caused injury to the wildlife, natural resources, health and welfare of Alabama residents in the subject area, the court finds that Alabama and the United States were suing in a *parens patriae* capacity as representative of all of its citizens including the *Wilhoite* plaintiffs. With this finding and because the instant plaintiffs are seeking the same relief as that requested and attained by Alabama and the United States in the earlier litigation, the court holds that plaintiffs' injunctive claims are barred by res judicata and that plaintiffs are bound by the terms and provisions of the consent decree.

## II

■ Whether a consent decree is a final judgment subject to collateral attack has already been addressed in this opinion. The court's finding that the state adequately represented the *Wilhoite* plaintiffs' interests in the earlier litigation would mandate a finding that the consent decree is a final judgment, not subject to collateral attack. However, as plaintiffs point out, consent judgments, like any other contract, can be vacated because of fraud, 18 C. Wright & A. Miller, *Federal Practice & Procedure*, § 4443 (1981), and may be collaterally attacked if the judgment is tainted by collusion between the parties. *Sam Fox*

*Publishing Co. v. United States*, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961).

■ Plaintiffs allege that a collateral attack on the consent decree is permissible because the decree is tainted by the United States' inherent conflicts of interest. This assertion is predicated on the argument that the Justice Department had been representing the interests of the United States Army and TVA, which were potential defendants, while at the same time pursuing an abatement action under various environmental statutes on behalf of the Environmental Protection Agency. As evidence of collusion, plaintiffs offer the fact that the guardian ad litem in the earlier litigation acknowledged that the United States gave up "a very strong" case to require Olin to take the F* alternative recommended by Water and Air Research, Inc., which was estimated to cost approximately $90 million in 1980 in favor of a remedial action plan which would take longer to execute.[9] *See,* Report of Guardian Ad Litem at 37.[10]

Plaintiffs argue that when the United States filed suit against Olin, it did so in its capacity as trustee for the natural resources at the arsenal, and that as trustee it had a conflict of interest with the beneficiaries of the trust.[11] They assert that a trustee bears an unwavering duty of complete loyalty to the beneficiaries which cannot be fulfilled if he has a conflicting interest. *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329–30, 101 S.Ct. 2789, 2794–95, 69 L.Ed.2d 672 (1981); *Manygoats v. Kleppe*, 558 F.2d 556, 558 (10th Cir.1977). Plaintiffs overlook the fact that the government and its attorneys are not to be held to the same "fastidious standards of a private fiduciary" when by law they are required to represent different and sometimes conflicting interests, *Nevada v. United States,*

9. The court notes, however, that the guardian ad litem ultimately voiced approval to the consent decree and proposal.

10. See, however, this court's discussion of the F* remedy in its Memorandum Opinion addressing the documents examined *in camera.*

There is an indication that the F* remedy came out of Army studies and was never really endorsed by environmental agencies or fish and wildlife officials.

11. Plaintiffs also advance a similar argument that the Army could not act as trustee.

463 U.S. 110, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983).[12]

The court has carefully reviewed *in camera* all of the documents surrounding the settlement negotiations and has fully considered all the information revealed therein and has determined that there is no evidence of fraud, collusion or conflict of interest which tainted the settlement, Memorandum Opinion filed March 22, 1985 at 7, and consequently finds that the consent decree may not be attacked on these grounds.

## III

■ Finally, defendants urge that plaintiffs' injunctive claims are untimely and barred by laches. Laches is purely an equitable doctrine by which equitable relief is denied to one who has been guilty of unconscionable delay in seeking that relief. 27 Am.Jur.2d *Equity*, § 152 (1966 & Supp. 1984). Federal courts look to state statutes to determine if equitable relief is barred unless the action is based on a federal claim. *Id.* at § 161. Under Alabama law, a court of equity may refuse relief by applying the doctrine of laches even though the claim is not barred by the statute of limitations. *Multer v. Multer,* 280 Ala. 458, 463, 195 So.2d 105, 109 (1966); *McCary v. Robinson,* 272 Ala. 123, 127, 130 So.2d 25, 29 (1961); *Alabama Cablevision Co. v. League,* 416 So.2d 433, 435 (Ala.Civ. App.1982). Ordinarily, the delay permitted by the statute of limitations does not constitute laches in the absence of special facts making delay culpable. *Hogan v. Carter,* 431 So.2d 1160, 1164 (Ala.1983); *Sims v. Lewis,* 374 So.2d 298, 305 (Ala. 1979). For laches to run, the plaintiff must have failed to do something which equity would have required them to do. *Hinesley v. Davidson,* 335 So.2d 380, 382 (Ala.1976). One court has enunciated the rule as follows:

The doctrine of laches is founded on the inequity of allowing a party claiming a right to avoid or affirm a transaction, to unnecessarily hold the right in abeyance, either to be enlightened by subsequent happenings as to how he will elect, or so that he will acquire an undue advantage over the other parts by reason of changed conditions. Hence what delay in bringing suit short of the statutory limitation, will constitute laches, is usually to be determined from what has occurred since the transaction involved, rather than from more lapse of time.

*Pratt Land & Improvement Co. v. McClain,* 135 Ala. 452, 459, 33 So. 185, 187 (1902).

■ This case is controlled by the same considerations which govern a motion to intervene after the judgment. *Hefner v. New Orleans Public Serv. Inc.,* 605 F.2d 893, 897 n. 12 (5th Cir.1979). The bar of laches applies where the plaintiff's inexcusable delay in asserting a claim unduly prejudices the defendant. *E.E.O.C. v. Dresser Industries, Inc.,* 668 F.2d 1199, 1202 (11th Cir.1982). The length of delay is ordinarily a matter within the trial court's discretion. *United States v. Paramount Pictures,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *United States by Bell v. Allegheny-Ludlum Industries, Inc.,* 553 F.2d 451 (5th Cir.1977) (per curiam), *cert. denied sub nom. United Steelworkers Justice Committee v. United States,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); Annot., 57 A.L.R.Fed. 150 (1982).

■ This circuit has adopted the standards for analyzing the timeliness of an application for intervention as set forth in *Stallworth v. Monsanto,* 558 F.2d 257 (5th Cir.1977):

The four factors considered in assessing timeliness included: (1) the length of time during which the intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene; (2) the extent of the prejudice that the existing

12. Although *Nevada* entailed a situation where Congress explicitly required a federal agency to represent dual interests, Congress has reserved the conduct of litigation and the supervision thereof in which the United States, an agency, or officer thereof, is a party to officers of the Justice Department. 28 U.S.C. §§ 516, 519.

parties to the litigation may suffer as a result of the would be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case; (3) the extent of the prejudice that the would be intervenor may suffer if his petition for leave to intervene is denied; (4) the existence of unusual circumstances militating either for or against a determination that the application is timely. *Stallworth*, 558 F.2d 257.

*Reeves v. Wilkes*, 754 F.2d 965, 969 (11th Cir.1985).

In examining the facts of the instant case, the court finds the following:

■ (1) In the entire period prior to entry of the consent decree, there was widespread publicity of the settlement, a 30-day period for public comment, and subsequent hearings concerning the proposed consent decree (at which counsel for the *Wilhoite* plaintiffs was present).[13] During this time period, the *Wilhoite* plaintiffs did not file a separate action based upon an injunctive claim, seek to intervene prior to the entry of the consent decree, or seek to object to or delay the consent decree's entry in any manner.

Plaintiffs assert that because their claims are not barred by the Alabama statute of limitations, "[d]elay permitted by the Statute of Limitations does not constitute laches in absence of special factors making the delay culpable." *Hogan v. Carter*, 431 So.2d 1160, 1164 (Ala.1983). The court finds that the plaintiffs' knowledge of the efforts expended by Olin subsequent to the consent decree is a special factor making the delay culpable.

(2) Permitting plaintiffs' action to continue would be prejudicial to Olin. In the period following entry of the consent decree, Olin has conducted elaborate studies and has spent substantial sums of money pursuant to its obligations under the consent decree. The continued assertion of plaintiffs' claim for injunctive relief will result in delay in the implementation of any remedial action.

(3) Because the court has determined that the instant plaintiffs' interests were adequately represented in the earlier litigation, the court holds that denying plaintiffs the opportunity to litigate their injunctive claims would not so prejudice them. Where an attempted intervenor "has no identity of interest with a party and then could not be bound, or where his interest is identical with the party and consequently he is adequately represented, we would find no prejudice sufficient to give weight to the third factor." *United States v. Jefferson County*, 720 F.2d 1511, 1517 (11th Cir.1983).

(4) Plaintiffs have advanced the argument that it was only after working with the case and understanding the government conflicts within the context of the earlier litigation that it became apparent that the Environmental Protection Agency was not doing its job and that the consent decree was inadequate. The court, however, has specifically found no collusion by the parties so as to give merit to this argument. As indicated, this argument is interesting in light of plaintiffs' argument with regard to *parens patriae*.

The motion will be granted.

## ON MOTION TO DISMISS

This cause comes on to be heard on a Motion to Dismiss Count One filed by the defendant the United States on May 25, 1984. By order of July 18, 1984, the motion was converted to a Motion for Summary Judgment. The facts of this case are set out in the court's Memorandum Opinion, also filed this date, which addressed

---

13. At these hearings, the court itself questioned at least one expert witness with regard to the reasonableness of the projected time period involved in the proposed remedy. Although, at the time of the hearings, there had been prior wide-spread publicity regarding the EPA and its officials and chemical pollution in general, only one letter type objection by one individual was filed. That did not relate to the time of the remedy and that individual did not appear at the hearing.

defendant Olin Corporation's Motion for Summary Judgment.

Plaintiffs' third amended complaint, filed March 16, 1984, sets forth the following factual matters and allegations concerning the United States:

Although plaintiff's third amended complaint seeks against the United States only injunctive relief, notices of claims under the Federal Tort Claims Act have been filed, or are in the process of being filed, on behalf of plaintiffs against the United States in connection with the incidents made the basis of this action. If those administrative claims are not resolved favorably to plaintiffs, the United States is put on notice that plaintiffs will also seek monetary damages against them under the Federal Tort Claims Act for the incidents hereinafter described.

\* \* \* \* \* \*

## COUNT ONE

28. Paragraphs 1 to 27 of this third amended complaint are hereby incorporated by reference.

29. The actions of defendants Olin and the Army constitute a continuing public and private nuisance.

30. As a direct and proximate result of the continuing and present nuisance created by Olin and the Army, plaintiffs have suffered special inconvenience, annoyance, irreparable, immediate, and continuing damage and injury not endured by the general public, for which injury and damage they are entitled to recover preliminary and final injunctive relief.

31. Wherefore, plaintiffs demand preliminary and final injunctive relief to require defendants Olin, the United States, and the appropriate agents of the United States, to remove any and all DDT and other contaminants on and in T.V.A. Property, Huntsville Spring Branch, Indian Creek, Wheeler National Wildlife Refuge, and the Tennessee River, immediately and in no event more than one year after the date of the Court Order and to require each other action by said defend-

ants and their agents as the Court shall deem appropriate.

The United States alleges, *inter alia,* that because plaintiffs' complaint sounds in tort, the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2674–2680 (hereinafter referred to as FTCA), provides a partial waiver of sovereign immunity for tort claims and that plaintiffs have not met the prerequisite of suing under that statute. They submit that plaintiffs must first exhaust their administrative remedies and that the relief sought must be monetary, not injunctive. The United States also urges that jurisdiction cannot be predicated on the Administrative Procedure Act, 5 U.S.C. § 702 (hereinafter referred to as the APA), because although the statute provides for court review of agency action, it also states that "Nothing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.*

Plaintiffs do not argue that they come within the purview of the FTCA and deny that they are suing thereunder. Instead, they insist that they are entitled to injunctive relief against the United States under the APA, that the court has jurisdiction under 28 U.S.C. § 1331, and that the APA does provide plaintiffs with an independent cause of action which gives this court federal question jurisdiction.

The Administrative Procedure Act provides in pertinent part as follows:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named

as a defendant in any such action and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (1976).

The APA provides a general source of judicial power to review final agency actions. *Broadway v. Block,* 694 F.2d 979, 986 (5th Cir.1982). The Act abolishes the defense of sovereign immunity only in actions for specific relief. 14 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 3659 (1985). The Supreme Court has concluded that the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action. *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977).[1]

Plaintiffs have directed the court's attention to several cases which they allege delineate the judicial review and relief available to them. However, in *Jaffee v. United States,* 592 F.2d 712 (3rd Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), the court held that the APA waives sovereign immunity in review of agency action where plaintiffs sought non-monetary relief under federal question jurisdiction by alleging that the government violated rights guaranteed by several constitutional amendments. Similarly, in *Sheehan v. Army and Air Force Exchange Service,* 619 F.2d 1132, 1139–40 (5th Cir.1980), *rev'd on other grounds,* 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982), plaintiff's complaint alleged constitutional violations and

the Fifth Circuit held that "Congress did intend to waive the defense of sovereign immunity for nonstatutory review under section 1331." *Id.* at 1139. Moreover, in cases cited by plaintiffs where the plaintiffs alleged jurisdiction pursuant to the APA and 28 U.S.C. § 1331, the underlying complaints were premised on either a federal statutory or constitutional claim. *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Glacier Park Foundation v. Watt,* 663 F.2d 882 (9th Cir.1981); *Rowe v. United States,* 633 F.2d 799 (9th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981); *Johnsrud v. Carter,* 620 F.2d 29 (3rd Cir.1980).

Clearly, there is a distinction between alleging jurisdiction under these statutes based on a federal question and on tort. The Tort Claims Act is the exclusive remedy for claims sounding in tort, 14 C. Wright, *supra* § 3658, and the APA confers no jurisdiction on this court to grant relief where another statute expressly or impliedly forbids the relief which is sought, as does the FTCA in this case. 28 U.S.C. § 2679.

Moreover, even if this court were to find jurisdiction under 28 U.S.C. § 1331, plaintiffs' case is further complicated by the fact that they are essentially alleging inaction. The Supreme Court has recently decided that an agency's decision not to take enforcement action should be presumed immune from judicial review under the APA and that the presumption may be rebutted where the substantive statute had provided guidelines for the agency to follow in exercising its enforcement powers. *Heckler v. Chaney,* — U.S. —, —, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). The court having been directed to no such statutory guidelines, the alleged agency inaction is found to be unreviewable.

The United States also submits that plaintiffs' first count is an impermissible

---

**1.** Clearly, before *Califano v. Sanders* courts were divided on whether the APA could be used

as a jurisdictional basis for bringing a claim. 14 C. Wright, *supra,* § 3655 n. 10.

collateral attack on the consent decree. After examining count one of plaintiffs' third amended complaint, the court finds that plaintiffs are seeking the same relief as that requested and attained by Alabama and the United States in the earlier *Olin* litigation. Thus, the court hereby incorporates the reasoning of Parts I and II of its Memorandum Opinion addressing Olin's Motion for Summary Judgment and holds that plaintiffs are bound by the terms and provisions of the consent decree as to the claim they have against the United States.[2]

Finally, plaintiffs argue that even if its injunctive claim against the United States constitutes a collateral attack on the consent decree, then such collateral attack is permissible in that the decree is tainted by the United States' inherent conflicts of interest. As noted in Part II of its above referenced Memorandum Opinion, the court has found no evidence to support a conflict of interest allegation.[3] The motion will be granted.

## FINAL JUDGMENT

In accordance with Memorandum Opinions filed contemporaneously herewith, the Motion for Summary Judgment filed by defendant Olin Corporation on June 11, 1984, and the Motion to Dismiss filed by the United States of America on May 25, 1984, converted to a Motion for Summary Judgment by Order of July 18, 1984, are GRANTED. The action in CV84–PT–1194–S is DISMISSED, with prejudice. Costs are assessed against the plaintiffs. The court finds and determines that there is no just reason for delay and directs that this judgment be entered as a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.[1]

2. The doctrine of laches may also provide an additional basis for the court's judgment.

3. Plaintiffs also allege that the United States' failure to file suit against the Army under Section 106(c) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9606, evidenced the conflict of interest. As noted earlier in this opinion, how-

ever, this is the very type of agency inaction presumed unreviewable by the Court. *Chaney,* at ——, 105 S.Ct. at 1657.

1. Since this claim has been severed and a new case number assigned, the latter finding, determination and direction may be surplusage.